Not for Publication

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| INDUSTRIAL COMMERCIAL CLEANING GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> OXFORD ELECTRONICS, INC. d/b/a OXFORD AIRPORT TECHNICAL SERVICES, <br><br> Defendant. | Civil Action No.: 24-7107 (ES) (JSA) <br><br> OPINION |

**SALAS, DISTRICT JUDGE**

Before the Court is defendant Oxford Electronics, Inc.'s, d/b/a Oxford Airport Technical Services, ("Defendant" or "Oxford") motion to dismiss plaintiff Industrial Commercial Cleaning Group, Inc.'s ("Plaintiff" or "ICCG") complaint (D.E. No. 1 ("Complaint" or "Compl.")). (D.E. No. 10 ("Motion" or "Mot.")). Having considered the parties' submissions, and deciding this matter without oral argument, *see* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b), and for the reasons set forth below, Defendant's Motion is **GRANTED** in-part and **DENIED** in-part.

**I.  BACKGROUND[1]**

Plaintiff is a New Jersey-based corporation that provides industrial and commercial cleaning services throughout New Jersey. (Compl. ¶¶ 1–2). Defendant is incorporated in Delaware and provides technical support services to commercial airlines and airports. (*Id.* ¶¶ 3–

---

[1] The factual background is taken from the allegations in the Complaint. For purposes of the instant Motion, the Court accepts the factual allegations as true and draws all inferences in the light most favorable to Plaintiff.  *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

4). According to the Complaint, on or about July 1, 2023, Plaintiff and Defendant entered into the contract in dispute for a project entitled "Operate, Maintain and Repair the Baggage Handling System (BHS); Maintain the Baggage Reconciliation System at the Newark Liberty International Airport – Five (5) Year Contract" (the "Project"). (*Id.* ¶¶ 13 & 18; *see* D.E. No. 1-2, Exhibit A to Compl. ("ICCG Contract" or "Ex. A")). Defendant allegedly desired to team with Plaintiff, a certified contractor of the "Port Authority [of New York and New Jersey (the "Port Authority")] MWBE,"[2] which satisfied certain goals that increased the chances of the Project being awarded to Defendant. (Compl. ¶¶ 14–15). According to the Complaint, the ICCG Contract provided that if Defendant received the Project, it would subcontract Plaintiff "in connection with same." (*Id.* ¶ 19).

On or about March 10, 2023, approximately four months before the parties' execution of the ICCG Contract, Defendant bid for the Project with the Port Authority and included Plaintiff's "pricing and MWBE credentials." (*Id.* ¶ 20). On or about July 7, 2023, Plaintiff maintains that Defendant, "and by extension ICCG, were awarded the contract with the Port Authority." (*Id.* ¶ 21).

Thereafter, specifically "[f]ollowing [Defendant's] award [of the contract with the Port Authority]," Plaintiff alleges that Defendant made two requests of ICCG that were not part of the ICCG Contract. (*Id.* ¶¶ 22–24). First, Defendant notified Plaintiff that the latter needed a permit and would be required to pay related fees to perform services on the Project. (*Id.* ¶ 22). Although Plaintiff commenced the "arduous application process," the Port Authority later informed ICCG that the permit and fees were not required. (*Id.* ¶ 23). Second, Defendant informed Plaintiff that

---

[2] Plaintiff does not define "MWBE" in the Complaint. (*See generally* Compl.). Defendant claims that upon information and belief, the acronym stands for "minority and/or woman owned business enterprise." (D.E. No. 10-1 ("Mov. Br.") at 2 n.2). Although Plaintiff does not dispute Defendant's characterization in opposition (*see generally* D.E. No. 13-1 ("Opp. Br.")), the acronym's meaning does not appear integral to the present Motion.

the latter needed a "CGL insurance policy"[3] for $25 million dollars to cover the Project—well in excess of the insurance covered under the parties' agreement. (*Id.* ¶ 24; *see* Ex. A § 7 (setting forth liability insurance requirements with "combined single limits of not less than $5 million per occurrence")). Defendant refused to pay for either the permit or the additional insurance coverage. (Compl. ¶¶ 26 & 29). Although Plaintiff informed Defendant that the additional insurance policy was "a change to the agreed upon scope of the ICCG Contract," Plaintiff obtained an insurance policy and incurred a $52,901.60 "binder fee" and a $168,000 annual premium. (*Id.* ¶¶ 25 & 27–28). Plaintiff reserved its rights to seek compensation from Defendant for the requested insurance (*id.* ¶ 27), and Defendant rejected "revised rates" submitted by ICCG on multiple occasions (*id.* ¶¶ 29 & 31; *see also id.* ¶ 48 (maintaining that Defendant refused to negotiate "ICCG's revised labor rates in good faith")).

Plaintiff alleges that, although the parties had a binding contract, Defendant engaged in "bid shopping" by "soliciting bids from other subcontractors for the services already contractually promised to ICCG." (*Id.* ¶ 30; *see also id.* ¶ 30(a) ("Bid shopping occurs when the prime contractor (*i.e.*, Oxford) discloses the price of one subcontractor (*i.e.*, ICCG) to its competitors in an attempt to obtain a lower price for the work.")). Defendant then "advised ICCG that it was terminating the ICCG Contract" and engaging another subcontractor to proceed with the Project. (*Id.* ¶ 31). Plaintiff maintains that Defendant wrongfully terminated ICCG "without cause, without justification, and without any notice or opportunity to cure." (*Id.* ¶ 40).

After Plaintiff's termination, the Port Authority informed ICCG that it was "not required to obtain the additional insurance coverage as directed by [Defendant]." (*Id.* ¶ 33). Specifically,

---

[3]  Plaintiff also does not define "CGL" in the Complaint. (*See generally* Compl.). Defendant refers to the requested policy as "commercial general liability" insurance in its moving brief. (Mov. Br. at 2). Plaintiff does not dispute Defendant's characterization in its opposition brief. (*See generally* Opp. Br.). While the term's meaning has no bearing on the underlying legal issues, the Court will, for the sake of clarity, adopt that meaning herein.

the Port Authority advised that subcontractors need only maintain insurance coverage totaling $5 million, while the "prime contractor (i.e., Oxford)" must maintain a $25 million CGL policy. (*Id.* ¶ 34). Plaintiff alleges that "[a]ccording to the Port Authority, Oxford was pushing down Oxford's contractual commitments to its subcontractors." (*Id.* ¶ 35). In addition, Plaintiff asserts Defendant acted in bad faith by failing to follow the Port Authority's "protocols for termination of a MWBE subcontractor, which required Oxford to explain to the Port Authority the basis for ICCG's termination; the steps Oxford took to accommodate ICCG's performance of work on the Project; and the steps Oxford took to find another MWBE to perform the work." (*Id.* ¶ 51). Defendant also did not obtain a waiver "from the Port Authority to release Oxford from the MWBE goals for the Project." (*Id.* ¶ 52).

As a result of the foregoing, Plaintiff maintains that it incurred over $3.3 million in damages, including but not limited to "the cost of additional insurance procured at the direction of Oxford, as well as lost profit and overhead on the unperformed work of ICCG in connection with the Project." (*Id.* ¶ 36). On June 19, 2024, Plaintiff filed the Complaint raising four causes action for wrongful termination (Count I), or alternatively, promissory estoppel (Count III), breach of the implied covenant of good faith and fair dealing (Count II), and violation of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1, *et seq.* (Count IV). (*Id.* ¶¶ 37–76). On November 13, 2024, Defendant moved to dismiss the Complaint. (*See* Mot. & Mov. Br.). On November 27, 2024, Plaintiff opposed (Opp. Br.), and on December 6, 2024, Defendant replied (D.E. No. 14 ("Reply Br.")).

**II.      LEGAL STANDARD**

In assessing whether a complaint states a cause of action sufficient to survive dismissal under Rule 12(b)(6), the Court accepts "all well-pleaded allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Cambridge Ret. Sys. v. Altisource Asset Mgmt.*

*Corp.*, 908 F.3d 872, 878 (3d Cir. 2018). However, the Court "disregard[s] threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Id.* at 878–79 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 681 (3d Cir. 2012)). The complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and a claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (first quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

While the Court generally "may not consider matters extraneous to the pleadings" when deciding a Rule 12(b)(6) motion, *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997), an exception to this general rule provides that the court may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *see also Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (noting that, pursuant to Rule 12(b)(6), the Court "may consider documents that are attached to or submitted with the complaint, and any 'matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case'" (alteration in original) (first citing *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002); and then quoting 5B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (3d ed. 2004))). Thus, "a court may consider 'an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.'" *Fuller v. Rozlin Fin. Grp., Inc.*, No. 19-20608, 2020 WL 5036215, at *2 (D.N.J. Aug. 26, 2020) (quoting *Clemons v. Midland Credit Mgmt., Inc.*, No. 18-

16883, 2019 WL 3336421, at *2 (D.N.J. July 25, 2019)).

Here, Plaintiff attached the ICCG Contract to the Complaint and Defendant does not dispute its authenticity or the Court's consideration of the same. (*See* Ex. A; *see generally* Mov. Br. & Reply Br.). Although Defendant also submitted a copy of the ICCG Contract with its reply brief (*see* D.E. No. 13-2), it does not indicate that this version is any different than the copy Plaintiff attached to the Complaint (*see generally* Reply Br.). Thus, the Court will consider the ICCG Contract appended to the Complaint.[4] (*See* Ex. A).

### III. DISCUSSION

#### A. Count I – Wrongful Termination

"To establish a breach of contract claim under New Jersey law, a plaintiff must show that: (1) the parties entered into a valid contract, (2) the defendant failed to perform its obligations under the contract, and (3) the claimant sustained damages as a result." *Ensey v. Gov't Emps. Ins. Co.*, 663 F. App'x 172, 176 (3d Cir. 2016) (citation modified).[5]

When evaluating a breach-of-contract claim, "[t]he court determines what obligations the parties owed each other, often by interpreting the express contract, and decides if one party failed to do what it promised." *Dougherty v. Drew Univ.*, 534 F. Supp. 3d 363, 373 (D.N.J. 2021) (citing

---

[4] As a preliminary matter, copies of the ICCG Contract submitted to the Court reflect that a representative for Defendant did not execute the agreement. (*See* Ex. A at 7 & 11; *see also* D.E. No. 13-2 at 7 & 11). However, neither party claims that the ICCG Contract was invalid or never fully executed. (*See generally* Mov. Br. & Opp. Br.). Rather, as noted below, Defendant's arguments acknowledge the existence of a valid contract, and Defendant maintains that it terminated the ICCG Contract pursuant to the agreement's terms. Accordingly, at this juncture, Defendant's apparent failure to sign the ICCG Contract presented to the Court is not dispositive. *See, e.g.*, *Beals v. Bank of Am., N.A.*, No. 10-5427, 2011 WL 5415174, at *10 (D.N.J. Nov. 4, 2011) ("[T]he failure to sign the document is not dispositive. Defendants' decision to cash the Beals plaintiffs' check and remain silent for over a month, without any indication that the agreement was still under review, is a sufficiently meaningful signal of an intention to be bound to state a claim for breach [of] contract.").

[5] Although Count I is entitled "wrongful termination," there is no dispute that this claim is one for breach of the ICCG Contract under New Jersey law on the basis of Defendant's alleged wrongful termination. For example, both parties refer to Count I as a breach of contract claim in their respective briefs and cite to New Jersey contract law in support of their arguments. (*See* Mov. Br. at 4–7 & Opp. Br. at 6–8).

*Woytas v. Greenwood Tree Experts, Inc.*, 206 A.3d 386, 392 (N.J. 2019)). "Contract interpretation is usually a question of law in New Jersey." *SmithKline Beecham Corp. v. Rohm & Haas Co.*, 89 F.3d 154, 159 (3d Cir. 1996) (citing *Dome Petroleum Ltd. v. Emps. Mut. Liab. Ins. Co.*, 767 F.2d 43, 47 (3d Cir. 1985)). "Under New Jersey law, courts should interpret a contract considering 'the objective intent manifested in the language of the contract in light of the circumstances surrounding the transaction.'" *Id.* (quoting *Dome Petroleum Ltd.*, 767 F.2d at 47). In doing so, the court is first tasked with evaluating whether a contract is clear or ambiguous. *See Fed Cetera, LLC v. Nat'l Credit Servs., Inc.*, 938 F.3d 466, 469 (3d Cir. 2019) (applying New Jersey law and finding that "whether a contract is clear or ambiguous is a question of law"). The court may rule on the interpretation of a contract on a motion to dismiss only when the contract is unambiguous. *Wells Fargo Bank, N.A. v. Lichter Gateway IV, LLC*, No. 17-2036, 2017 WL 5957072, at *20 (D.N.J. Dec. 1, 2017). To determine whether a contract is ambiguous, the court may "'consider the words of the agreement, alternative meanings suggested by counsel, and extrinsic evidence offered in support of those meanings.'" *Newport Assocs. Dev. Co. v. Travelers Indem. Co. of Ill.*, 162 F.3d 789, 792 (3d Cir. 1998) (quoting *Pennbarr Corp. v. Ins. Co. of N. Am.*, 976 F.2d 145, 151 (3d Cir. 1992)). "'[W]hen the terms of [a] . . . contract are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties.'" *Mylan Inc. v. Smithkline Beecham Corp.*, No. 10-4809, 2010 WL 4181139, *2 (D.N.J. Oct. 20, 2010) (quoting *Kampf v. Franklin Life Ins. Co.*, 161 A.2d 717, 720 (N.J. 1960)).

Defendant makes a single argument to support the dismissal of Count I: it cannot be held liable for breach of contract as a matter of law because Defendant may terminate the ICCG Contract for any reason pursuant to its terms. (Mov. Br. at 5–6 (citing Ex. A § 10.1)). Plaintiff opposes, arguing that (i) it adequately pled a breach of contract claim and (ii) the ICCG Contract

7

conditioned Defendant's termination on ICCG's failure to perform its obligations, which Plaintiff fulfilled to date.  (Opp. Br. at 6–8).  In reply, Defendant maintains that the clause Plaintiff cites is separated by commas and thus cannot be read as a condition precedent to Defendant's right to terminate the ICCG Contract for any reason.  (Reply Br. at 2–3).  Based on a plain reading of the termination clause, the allegations in the Complaint, and Defendant's narrow argument in support of dismissal, the Court agrees that Plaintiff has sufficiently pled a breach of contract claim for wrongful termination, albeit for slightly different reasons.

Section 10.1 of the ICCG Contract is entitled "OXFORD Right to Terminate," and states that:

> Oxford may, for any reason, without prejudice to any right or remedy it may have **due to any failure of Contractor to perform Contractor's obligations under this Agreement**, terminate this Agreement or any Statement of Work upon thirty (30) days' prior written notice to Contractor.  OXFORD shall pay Contractor for all work performed up to the date of termination in accordance with the payment requirements contained in this Contract.  The parties agree that, in the event of a dispute or alleged breach they will work together in good faith to first resolve the matter internally.

(Ex. A § 10.1 (emphasis added)).  The Court agrees with Defendant that the clause emphasized above cannot be read as a condition precedent to Defendant's right to terminate the ICCG Contract for any reason.  In particular, the entirety of the second clause separated by commas[6] merely states that in addition to Defendant's right to terminate for any reason, such termination is without prejudice to any separate right or remedy Defendant may have in the event Plaintiff failed to perform its contractual obligations.  (*See id.*).  The clause does not, as Plaintiff suggests, require that ICCG fail to perform a contractual obligation *before* Defendant may exercise its right to

---

[6] For the avoidance of doubt, the entirety of the second clause separated by commas reads "without prejudice to any right of remedy [Defendant] may have due to any failure of Contractor to perform Contractor's obligations under this Agreement."  (Ex. A § 10.1).

8

terminate "for any reason." (*See id.*). Indeed, if Plaintiff were correct, the language that permits Defendant to terminate "for any reason" would be rendered meaningless.

Notwithstanding this plain and unambiguous reading of the termination clause, the Court finds that Plaintiff has adequately pled a breach of contract claim for wrongful termination. Plaintiff alleges that after "reject[ing] the revised rates," Defendant "advised ICCG that it was terminating the ICCG Contract and proceeding on the Project with another subcontractor." (Compl. ¶ 31). Significant here, the Complaint further alleges Defendant "wrongfully terminated ICCG without cause, without justification, and ***without any notice*** or opportunity to cure." (*Id.* ¶ 40 (emphasis added)). Based on these allegations, which the Court must accept as true at this juncture, Defendant did not abide by the thirty-day written notice requirement set forth in the termination clause. (*See* Ex. A § 10.1).[7] For this reason, and because Defendant does not dispute the validity of the ICCG Contract or any aspect of Plaintiff's alleged damages for breach of contract, Defendant's motion to dismiss Count I is **DENIED**.

**B.    Count III – Promissory Estoppel** (*pled in the alternative to Count I*)

To state a valid promissory estoppel claim, a plaintiff must show that: (i) there was a "clear and definite promise"; (ii) there was an expectation that the plaintiff would rely on that promise; (iii) the plaintiff reasonably relied on the promise; and (iv) there was a "definite and substantial" harm to the plaintiff. *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (quoting *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington*, 944 A.2d 1, 19 (N.J. 2008)).

Defendant argues the allegations do not reflect a clear and definite promise to Plaintiff sufficient to sustain a claim for promissory estoppel. (Mov. Br. at 9–10). Instead, Defendant

---

[7]    In addition, although Plaintiff alleges it "complied with all of its obligations under the terms of the ICCG Contract" (Compl. ¶ 41), the allegations are silent as to whether, with respect to the present claims, Defendant "work[ed] together [with Plaintiff] in good faith to first resolve the matter internally" (*see* Ex. A § 10.1), as required under the termination clause.

9

maintains "to the extent [it] made any promise" to Plaintiff in March 2023 via its submission of its bid to the Port Authority, the promise "was expressly contingent upon the future occurrence of an act of the Port Authority, and therefore not definite." (*Id.*). In addition, Defendant claims Plaintiff's purported reliance on its alleged promise "did not result in a definite and substantial detriment" to Plaintiff. (*Id.* at 10). Defendant asserts that Plaintiff failed to identify a specific or substantial opportunity that it lost in reliance on Defendant's purported promise. (*Id.* at 10–11). Lastly, Defendant argues Plaintiff's promissory estoppel claim should be dismissed as duplicative of its breach of contract claim. (*Id.* at 11–12).

In opposition, Plaintiff maintains Defendant's promise was not "indefinite" because it received the Project from the Port Authority; thus, the "indefinite" contingency was fulfilled when the Port Authority awarded Defendant the contract on or about July 7, 2023, and this occurrence required Defendant to make good on its promise to Plaintiff. (*See* Opp. Br. at 14; *see also* Compl. ¶ 21). Plaintiff also argues that it adequately pled facts reflecting detrimental reliance, including lost business opportunities and out-of-pocket costs of over $3.3 million, and that it need not set forth evidence of specific losses at the pleading stage. (Opp. Br. at 14). Finally, Plaintiff argues that its promissory estoppel claim is properly pled in the alternative to its breach of contract claim citing, without analysis, *Dansko Holdings, Inc. v. Benefit Trust Co.*, 991 F.3d 494 (3d Cir. 2021). (*Id.* at 14–15).

Courts in this District have held that to the extent a valid claim for breach of contract exists, there is an "adequate remedy at law," which precludes a duplicative claim for promissory estoppel. *See, e.g.*, *Cont'l Cas. Co. v. DD Care Mgmt., LLC*, No. 21-19806, 2022 WL 2870207, at *5 (D.N.J. July 21, 2022) (quoting *Adamson v. Ortho-McNeil Pharm., Inc.*, 463 F. Supp. 2d 496, 505 (D.N.J. 2006)). Indeed, "[a]lthough plaintiffs may plead in the alternative under Rule 8(d)(2), they cannot

10

assert both breach of contract and promissory estoppel claims unless the contract is disputed or the matter at issue is beyond that covered in the contract." *Gujja v. Inpatient Servs. of New Jersey, P.C.*, No. 21-19416, 2022 WL 2834998, at *3 (D.N.J. July 20, 2022). Thus, "promissory estoppel generally serves as a stop-gap where no valid contract exists to enforce a party's promise." *Kiss Elec., LLC v. Waterworld Fiberglass Pools, N.E., Inc.*, No. 14-3281, 2015 WL 1346240, at *5 (D.N.J. Mar. 25, 2015).

As noted above, Plaintiff alleges the existence of a valid contract and Defendant acknowledges the same. (*See, e.g.*, Mov. Br. at 11 (noting that the "teaming arrangement" at issue "was documented in the Contractor Agreement")). Although Plaintiff alleges Defendant made certain demands beyond the ICCG Contract's express terms, the Complaint does not plead, nor does Plaintiff argue, that its promissory estoppel claim encompasses clear promises Defendant made beyond the agreement's plain terms. (*See generally* Compl.; *see also* Opp. Br. at 12–15). Rather, Plaintiff identifies Defendant's promise as its commitment "to subcontract with ICCG in the event that Oxford was awarded the contract with the Port Authority." (Opp. Br. at 13; *see also* Compl. ¶¶ 55 & 56 (alleging that Defendant used "ICCG's pricing information and MWBE credentials to obtain the contract with the Port Authority" in exchange for "a firm and definitive offer to subcontract with ICCG and utilize ICCG services in the event that it was awarded the contract for the Project by the Port Authority")). But Plaintiff does not allege Defendant failed to subcontract with ICCG. Instead, the Complaint maintains the parties entered the ICCG Contract and Defendant "wrongfully terminated" that agreement. (Compl. ¶ 61). Lastly, and to be certain, the relief Plaintiff seeks under Counts I and III is identical. (*Compare id.* ¶ 44 (claiming, under Count I, that ICCG incurred additional insurance costs and demanding judgment against Defendant for over $3.3 million), *with id.* ¶¶ 60 & 63 (claiming, under Count III, that Plaintiff incurred

11

"additional insurance coverage at the direction of Oxford" and that ICCG "suffered damage[s] in excess of $3.3 million dollars")).

Plaintiff's citation to *Dansko Holdings* is inapposite. (*See* Opp. Br. at 14–15). In *Dansko Holdings*, the Third Circuit reviewed the district court's dismissal of a promissory estoppel claim under Pennsylvania law, which is inapplicable here. *See* 991 F.3d at 499. Furthermore, notwithstanding any differences between Pennsylvania and New Jersey law, the plaintiff in *Dansko Holdings* did "not try[] to use estoppel to enforce the words of the trust agreement." *Id.* Rather, the plaintiff relied on "statements [defendant] allegedly made *after* signing the agreement" in furtherance of a separate claim for promissory estoppel. *Id.* Here, while Plaintiff alleges that Defendant made certain demands outside of the ICCG Contract's express terms (*see* Compl. ¶¶ 22 & 24; *see also* Ex. A § 7), Plaintiff has not set forth any statements or promises by Defendant (verbal or written) that ICCG purportedly relied on before it secured an additional insurance policy and permit (*see generally* Compl.). Instead, Plaintiff repeatedly alleges that Defendant made certain demands and refused to pay ICCG's "revised rates." (*See* Compl. ¶¶ 22, 24, 29 & 31).

For these reasons, the Court finds that Counts I and III are duplicative. Defendant's motion to dismiss Count III is **GRANTED** and Count III is **DISMISSED** *without prejudice*. *See Zydus Worldwide DMCC v. Teva API Inc.*, 461 F. Supp. 3d 119, 141 (D.N.J. 2020) (dismissing the promissory estoppel claim where neither side said that plaintiff "could *prevail* on both a breach of contract and promissory estoppel theory"); *Brown v. HSBC*, No. 24-8025, 2025 WL 947728, at *8 (D.N.J. Mar. 28, 2025) (dismissing promissory estoppel claim where plaintiff did not "contest the validity of the contract . . . and state[d] that her promissory estoppel claim [was] based on the same allegations as her breach of contract claim"); *Gujja*, 2022 WL 2834998, at *4 (citing *Automated Salvage Transpt., Inc., v. NV Koninklijke KNP BT*, 106 F. Supp. 2d 606, 622 (D.N.J. 1999)

(dismissing promissory estoppel claim where plaintiff failed to allege that defendant made a "concrete promise")).[8]

### C.     Count II – Breach of the Covenant of Good Faith and Fair Dealing

"Every party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 395 (N.J. 2005). "The covenant of good faith and fair dealing calls for parties to a contract to refrain from doing 'anything which will have the effect of destroying or injuring the right of the other party to receive' the benefits of the contract." *Id.* at 396 (quoting *Palisades Props., Inc. v. Brunetti*, 207 A.2d 522, 531 (N.J. 1965)). Proof of "bad motive or intention" is essential to an action for breach of the covenant. *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001). Importantly, the covenant of good faith and fair dealing involves an implied duty, and a breach of such implied covenants must differ from a literal violation of the contract. *Wade v. Kessler Inst.*, 798 A.2d 1251, 1259 (N.J. 2002); *see Brunswick Hills Racquet Club, Inc.*, 864 A.2d at 396 ("A plaintiff may be entitled to relief under the covenant [of good faith and fair dealing] if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose."). In addition, "a plaintiff may get relief if it relies to its detriment on a defendant's intentional misleading assertions." *Brunswick Hills Racquet Club, Inc.*, 864 A.2d at 396 (citing *Bak–A–Lum Corp. v. Alcoa Building Prods., Inc.*, 351

---

[8]     For the sake of clarity, in the event Plaintiff files an amended complaint, it should endeavor to clarify the relevant timeline of certain events. For example, the Complaint is silent with respect to the date Defendant terminated the ICCG Contract. In addition, the Complaint alleges that the parties entered the ICCG Contract on or about July 1, 2023 (Compl. ¶ 18), and the copy of the agreement attached to the Complaint includes a preamble that states it was made on the "1st day of July, 2023" (Ex. A at 2). However, the signature from Plaintiff's representative reflects an execution date of "7-12-2023." (*Id.* at 7 & 11). And, as noted above, copies of the agreement submitted to the Court do not contain a signature from Defendant. (*See* Ex. A at 7; *see also* D.E. No. 13-2 at 7). Moreover, although Defendant allegedly demanded a permit and additional insurance "[f]ollowing [Defendant's] award [of the contract with the Port Authority]" on July 7, 2023 (*see* Compl. ¶¶ 21–24), the Complaint does not specify when those demands occurred in relation to contract formation.

A.2d 349, 352 (N.J. 1976)).

Courts generally apply claims for breach of the implied covenant of good faith and fair dealing in three ways, including (i) to "permit[] the inclusion of terms and conditions not expressly set forth in the written contract," (ii) "to allow redress for bad faith performance of an agreement even where the defendant has not breached any express term," and (iii) to "permit[] inquiry into a party's exercise of discretion expressly granted by the contract's terms." *Adler Eng'rs, Inc. v. Dranoff Props., Inc.*, No. 14-0921, 2014 WL 5475189, at *11 (D.N.J. Oct. 29, 2014) (citing *Seidenberg v. Summit Bank*, 791 A.2d 1068, 1076 (N.J. App. Div. 2002)). Notably, however, a claimant "may not maintain a separate action for breach of the implied covenant of good faith and fair dealing [where] it would be duplicative of [its] breach of contract claim." *Id.* (quoting *Hahn v. OnBoard LLC*, No. 09-3639, 2009 WL 4508580, at * 6 (D.N.J. Nov. 16, 2009)).

Defendant argues Count II is barred by the termination clause which, as discussed above, permits Defendant to terminate the ICCG Contract for any reason. (Mov. Br. at 7–8). Thus, Defendant's position is that Plaintiff cannot claim Defendant acted in bad faith by allegedly refusing to negotiate revised rates and "bid shopping." (*Id.*). Similarly, Defendant contends the Complaint does not identify a duty or expectation that Defendant would bargain with Plaintiff on revised rates or refrain from seeking additional bids. (*Id.* at 8). In opposition, Plaintiff again argues that Defendant could not terminate the ICCG Contract without cause. (Opp. Br. at 8). Plaintiff maintains Defendant acted in bad faith and denied Plaintiff the benefit of the ICCG Contract by: (i) improperly delegating permit fees and insurances costs; (ii) failing to negotiate revised rates with ICCG; (iii) improperly terminating ICCG without justification; (iv) participating in bid shopping, and (v) "refusing to reimburse ICCG for significant expenses incurred at Oxford's direction, such as additional insurance coverage." (*Id.* at 9–11). In addition, Plaintiff asserts that

14

Defendant overlooks its alleged "improper conduct [ ] *caused* ICCG's rates to change" (*id.* at 11), and that Defendant "change[d] the original scope of the ICCG Contract . . . in an attempt to skirt its contractual obligations to the Port Authority" (*id.* at 12; *see* Compl. ¶¶ 51–52).

In New Jersey, "a party to a contract may breach the implied covenant of good faith and fair dealing in performing its obligations even when it exercises an express and unconditional right to terminate." *Wilson*, 773 A.2d at 1126 (quoting *Sons of Thunder, Inc. v. Boren, Inc.*, 690 A.2d 575, 588 (N.J. 1997)). Therefore, notwithstanding whether Defendant provided Plaintiff with thirty days written notice, Defendant's exercise of its right to terminate the ICCG Contract for any reason cannot overcome Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. Indeed, "a jury reasonably could find that [a party] had breached its duty of good faith, not by terminating the agreement, but based on its conduct preceding cancellation of the agreement." *Atl. City Racing Ass'n v. Sonic Fin. Corp.*, 90 F. Supp. 2d 497, 511 (D.N.J. 2000) (citing *Sons of Thunder, Inc.*, 690 A.2d at 589).

Drawing all inferences in Plaintiff's favor as the Court must at this stage, the Complaint arguably asserts bad faith conduct that falls outside the parameters of the ICCG Contract and may form the basis of a claim for breach of the implied covenant of good faith and fair dealing. This conduct includes, for example, Defendant's alleged demands for excess insurance coverage beyond the contractually required amount and its purported bid shopping to secure another subcontractor at a lower price.[9] (*Compare* Compl. ¶¶ 22–25, 30 & 49–50, *with* Ex. A). Furthermore, Count II is not duplicative of Count I because the latter focuses on Defendant's

---

[9] The Court rejects Defendant's justification for alleged bid shopping—i.e., that "if termination is imminent, Oxford should be permitted to solicit bids from replacement subcontractors." (Mov. Br. at 8). First, Defendant provides no authority in support of its assertion, which also falls outside the four corners of the Complaint. Second, and relatedly, Defendant allegedly failed to notify Plaintiff of the agreement's termination altogether. For these reasons, it remains plausible that Defendant's alleged bid shopping and demands for additional insurance were conducted in bad faith to secure a cheaper subcontractor before it terminated the ICCG Contract without notice.

15

wrongful termination of the ICCG Contract, while the former centers on Defendant's conduct and demands prior to the termination. For these reasons, Plaintiff has alleged a sufficient claim for breach of the implied covenant of good faith and fair dealing and Defendant's motion to dismiss Count II is **DENIED** *without prejudice*.

      **D.**      **Count IV – NJCFA Claim**

Lastly, under the NJCFA, a plaintiff must allege—with the specificity required pursuant to Federal Rule of Civil Procedure 9(b)[10]—the following: "(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Payan v. Greenpoint Mortg. Funding, Inc.*, 681 F. Supp. 2d 564, 572 (D.N.J. 2010). The NJCFA defines unlawful conduct, i.e., an "unlawful practice," as:

> [t]he act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid[.]

N.J. Stat. Ann. § 56:8-2. Any "person" harmed by unlawful practices as defined above may bring a private right of action under the NJCFA. N.J. Stat. Ann. § 56:8-19. A "person" under the NJCFA

---

[10] Rule 9(b)'s heightened pleading requirement concerning allegations of fraud applies to NJCFA claims. *Frederico v. Home Depot*, 507 F.3d 188, 202–03 (3d Cir. 2007) (reviewing dismissal of NJCFA claim under Rule 9(b)). Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "[T]he law does not require specificity just for specificity's sake"; rather, "[t]he level of particularity required is sufficient details to put [d]efendants on notice of the 'precise misconduct with which they are charged.'" *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 104 (D.N.J. 2011) (quoting *Franulovic v. Coca-Cola Co.*, No. 07-0539, 2007 WL 3166953, at *11 (D.N.J. Oct. 25, 2007)). In other words, to satisfy Rule 9(b)'s specificity requirement, "the pleadings must state what the misrepresentation was, what was purchased, when the conduct complained of occurred, by whom the misrepresentation was made, and how the conduct led plaintiff to sustain an ascertainable loss." *Smajlaj*, 782 F. Supp. 2d at 104 (quoting *Zebersky v. Bed Bath & Beyond, Inc.*, No. 06-1735, 2006 WL 3454993, at *4 (D.N.J. Nov. 29, 2006)).

includes, for example, "any . . . corporation, company, trust, business entity or association." *Id.* § 56:8-1(d). "Merchandise" includes "any objects, wares, goods commodities, services or anything offered, directly or indirectly to the public for sale." *Id.* § 56:8–1(c).

A business, "may only seek relief under the NJCFA 'when it finds itself in a consumer-oriented transaction.'" *Kare Distribution, Inc. v. Jam Labels & Cards LLC*, No. 09-0969, 2009 WL 3297555, at *5 (D.N.J. Oct. 9, 2009) (quoting *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 560 (D.N.J. 2002)). "New Jersey courts have consistently held that a 'purchaser of wholesale goods for resale are not consumers within the meaning of the NJCFA.'" *Id.* (quoting *Bracco Diagnostics, Inc.*, 226 F. Supp. 2d at 560–61). Moreover, with respect to services, "[t]he challenged services generally must be of the type sold to the general public." *Bracco Diagnostics, Inc.*, 226 F. Supp. 2d at 561.

Defendant argues that Plaintiff has not establishing standing to assert a claim under the NJCFA. (Mov. Br. at 12–13). Specifically, Plaintiff has not pled that it is a "consumer" within the meaning of the NJCFA. (*Id.*). Instead, under the ICCG Contract, Plaintiff is a service provider of "specialized airport staffing services" and Defendant is the consumer. (*Id.* at 13). Defendant also maintains the services provided under the ICCG Contract are "not the type procured by or even available to consumers in the popular sense." (*Id.*). In addition, Defendant asserts Plaintiff failed to set forth a NJCFA claim with the specificity required under Rule 9(b). (*Id.* at 13–16).

In opposition, Plaintiff acknowledges that "[w]hile the [NJ]CFA's broad remedial purpose is to protect consumers from fraudulent commercial trade practices, it is not limited to consumers alone" and "can also apply to ***sellers***, such as ICCG," in the context of commercial transactions. (Opp. Br. at 15–16 (emphasis added)). Plaintiff argues that it pled sufficient facts to put Defendant on notice of the conduct at issue such that the Complaint meets the heightened pleading standard

17

of Rule 9(b).  (*Id.* at 18).  To the extent the Court finds that the Complaint does not plead a NJCFA claim with specificity, Plaintiff seeks leave to file an amended complaint.  (*Id.* at 18–19).

The Court agrees Plaintiff lacks standing to assert a claim under the NJCFA.  Akin to *Kare Distrib., Inc. v. Jam Labels & Cards LLC*, "[Plaintiff] is not even a purchaser of wholesale services, it is the seller."  *See* 2009 WL 3297555, at *5 (noting that "[n]owhere in its pleading does A & M allege that it purchased or consumed goods or services from Kare, as would be required to state a claim under the NJCFA").  Indeed, Plaintiff concedes it is the seller of services and fails to provide direct authority in support of its contention that the NJCFA applies equally to sellers in the context of commercial transactions.  (Opp. Br. at 15–16).  Indeed, neither of the cases that Plaintiff cites in support of that contention involved a "seller" asserting a NJCFA claim.  (*Id.* at 15) (first citing *Francis E. Parker Mem'l Home, Inc. v. Georgia-Pac. LLC*, 945 F. Supp. 2d 543 (D.N.J. 2013) (wherein purchases of an exterior trim product asserted claims under the NJCFA); and then citing *Jefferson Loan Co. v. Session*, 938 A.2d 169 (N.J. App. Div. 2008) (wherein the co-signor on a consumer loan asserted a NJCFA against the lender's assignee)).[11]  The court in *Kare Distribution, Inc.* rejected a nearly identical argument, reasoning that the NJCFA unambiguously protects consumers—not sellers—notwithstanding whether the transaction at issue involves the type of "consumer transaction" protected under the statute.  2009 WL 3297555, at *5.  Thus, as the seller of services, Plaintiff cannot maintain a claim under the NJCFA and Count IV fails as a matter of law.  *See id.*; *see also Specialty Ins. Agency v. Walter Kaye Assocs., Inc.*, No. 89-1708, 1989 WL 120752, at *5–6 (D.N.J. Oct 2, 1989) (noting that the NJCFA's "protection is limited to consumers" and dismissing NJCFA claim where "[plaintiff] . . . simply [did] not alleg[e] that it was wronged as a consumer" (citing *Channel Companies, Inc. v. Britton*, 400 A.2d 1221 (N.J.

---

[11]     The Court notes that, when citing these cases, Plaintiff did so generally, without pinpoint citations, let alone any explanation of how they might support its argument.  (*Id.*).

18

App. Div. 1979))).

Accordingly, Defendant's motion to dismiss Count IV is **GRANTED.**  As no amendment would be sufficient to cure this fundamental, fatal flaw in Plaintiff's NJCFA claim, the Court will dismiss Count IV *with prejudice*.  *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (after finding that a plaintiff's allegations fail under Rule 12(b)(6), "the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile" (citing *Shane v. Fauver*, 213 F.3d 113, 116 (3d Cir. 2000))).

**IV.   CONCLUSION**

For the foregoing reasons, Defendant's Motion is **GRANTED** in-part and **DENIED** in-part.  An appropriate Order accompanies this Opinion.


Dated:  June 30, 2025                                s/ *Esther Salas*
                                                    **Esther Salas, U.S.D.J.**